**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| RICHARD HAROLD SHEARER, | No. 21-CV-1014 CJW-MAR |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| vs. | |
| HIRSCHBACH MOTOR LINES, INC., | |
| Defendant. | |

———————————————

**TABLE OF CONTENTS**

I.     BACKGROUND ............................................................................ 4

        A.    The Parties and Others .............................................................. 4

        B.    The Agreement ......................................................................... 5

        C.    Truck Lease .............................................................................12

        D.    Plaintiff's Performance of Services ...........................................12

        E.    Plaintiff's Interactions with Gatena ..........................................14

        F.    Plaintiff's Driving for Defendant After Reporting
              Sexual Harassment ..................................................................16

        G.    Knowledge of Sexual Relationships Among Defendant's
              Employees ...............................................................................18

II.    SUMMARY JUDGMENT STANDARD .............................................19

III.   DISCUSSION ..................................................................21

A.   Whether Plaintiff Was an Independent Contractor .........................22

     1.   Plaintiff's Control Over Tasks.........................................24

     2.   Skill Required ...........................................................25

     3.   Source of Instrumentalities and Tools ................................26

     4.   Location of Work .......................................................27

     5.   Duration of the Relationship .........................................27

     6.   Defendant's Assignment of Additional Work .........................28

     7.   Plaintiff's Control Over Time and Hours.............................28

     8.   Method of Payment.....................................................29

     9.   Plaintiff's Role in Hiring and Paying Assistants.....................29

     10.   Defendant's Regular Business ........................................30

     11.   Whether Defendant is in Business ...................................30

     12.   Provision of Employee Benefits ......................................31

     13.   Plaintiff's Tax Treatment .............................................31

     14.   Economic Realities ....................................................32

     15.   Terms of Agreement ...................................................32

     16.   Summary ................................................................33

B.     Whether There is Evidence of Retaliation ....................................34

     1.     Retaliation by Decreasing Revenue ...................................35

     2.     Retaliation by Removal From Truck ..................................39

C.     Whether There is Evidence Defendant Knew of Danger ...................41

IV.     CONCLUSION ...............................................................................46

This matter is before the Court on defendant's motion for summary judgment on plaintiff's complaint alleging sexual harassment, retaliation, and negligent hiring, retention, and supervision. (Docs. 29 & 33). Plaintiff filed a timely resistance. (Docs. 40 & 42). Defendant filed a timely reply. (Doc. 48). For the following reasons, the Court **grants** defendant's motion for summary judgment.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. The Court will discuss additional facts as they become necessary to its analysis.

### A. The Parties and Others

Plaintiff Richard Shearer is a professional truck driver who earned a commercial driver's license. (Docs. 29-1, at 1; 40-1, at 2). Defendant Hirschbach Motor Lines, Inc., ("defendant" or "the Company") is an Iowa corporation engaged in interstate trucking. (Docs. 29-1, at 1; 40-1, at 1). Defendant employs drivers working directly for it and also hires independent contractors to haul loads for it. (Docs. 29-1, at 13; 40-1, at 24). Kara Gatena ("Gatena") was employed with defendant as the Senior Director of Fleet Management and later as a driver manager until she was fired in November 2020. (Docs. 29-1, at 2; 40-1, at 2; 40-2, at 12-13; 45, at 16-17). Gatena was a member of upper management. (Docs. 40-1, at 2; 40-2, at 12-13; 45, at 16-17). Dan Wallace ("Wallace"), defendant's President, was Gatena's direct supervisor. (Docs. 29-1, at 2; 40-1, at 2).

From approximately 2016 through 2020, plaintiff provided trucking services for companies, including defendant. (Docs. 29-1, at 1; 40-1, at 2).

On March 5, 2019, while attending a driver orientation program at defendant's headquarters, plaintiff signed paperwork authorizing a law firm to form an Iowa limited liability company for him, which he called Truckin Right, LLC ("Truckin Right"). (Docs. 29-1, at 2; 40-1, at 2–4). Defendant preferred contracting with entities, as

4

opposed to individuals, because it made it easier for defendant to argue that the drivers were independent contractors. (Docs. 40-2, at 4; 45, at 5-6).

### B. The Agreement

On March 6, 2019, plaintiff, through his company Truckin Right, and defendant entered into "Independent Contractor Agreement" ("Agreement"). (Docs. 29-1, at 2; 40-1, at 3-4; 31, at 21-49). In the Agreement, plaintiff's company was identified as the "contractor" and defendant as the "carrier."

Paragraph 1 of the Agreement provided:

> **STATUS AND INTENT OF PARTIES.** The parties expressly intend and stipulate that CONTRACTOR is and shall remain an independent contractor, as distinguished from an employee or agent of CARRIER, throughout the term of this Agreement. Neither CONTRACTOR nor any driver, employee or other worker engaged by CONTRACTOR shall be deemed an employee or agent of CARRIER under any circumstances or for any purpose, including but not limited to, federal or state payroll taxes, income tax withholding, workers' compensation coverage or unemployment insurance tax.

(Doc. 31, at 21).

Paragraph 2(b) of the Agreement provided that "[e]ither party may provide written notice of termination to the other party[.]" (*Id.*).

Paragraph 3 of the Agreement states, in pertinent part:

> **PROVISION OF SERVICES AND EQUIPMENT.**
> CONTRACTOR agrees and warrants:
> (a) During the term of this Agreement, CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation related services, and the use of the Equipment identified in the table below for freight-hauling on behalf of CARRIER.
> ***
> (d) To furnish at its expense all fuel, maintenance, repairs and other items necessary to the operation of the equipment. CONTRACTOR shall have the right to maintain and repair the Equipment at any place contractor

5

chooses at CONTRACTOR's expense. CONTRACTOR may, at CONTRACTOR'S discretion, participate in any fuel purchase or maintenance and repair program offered by CARRIER to facilitate efficiency and economy in those regards, but in any event, the ultimate responsibility to maintain, including but not limited to fueling, the Equipment in proper working condition and in full compliance with all applicable laws and regulations shall remain with CONTRACTOR.

(e) That, according to FMCSA Regulations, CONTRACTOR shall, at CONTRACTOR's expense, equip and maintain the Equipment in safe condition and in complete compliance with all laws and regulations of the states in which CONTRACTOR operates and the DOT. In order to ensure compliance with all DOT regulations—and unless CONTRACTOR provides CARRIER a copy of an inspection report showing the Equipment passed a full annual DOT inspection pursuant to 49 C.F.R. § 396.17 within sixty (60) days before the Effective Date of this Agreement—CONTRACTOR shall, at CONTRACTOR's expense, at the start of this Agreement, make the Equipment available for such an inspection at a maintenance facility operated or approved by CARRIER, and shall have any necessary maintenance or repairs done at CONTRACTOR's expense. During this Agreement, CONTRACTOR shall, at CONTRACTOR's expense, have a full annual DOT inspection performed once every one hundred eighty (180) days at a maintenance facility operated or approved by CARRIER. . ...

(f) That, according to FMCSA Regulations, including at 49 C.F.R. Part 390, the Equipment subject to this Agreement shall be "placarded" on both sides to identify CARRIER, under whose authority it is being operated. Similarly, CARRIER'S name shall appear on both sides of the unit following the words "OPERATED BY." The identification contemplated herein shall be affixed to the Equipment by CARRIER at CARRIER'S cost, before placing the Equipment in CARRIER's service, and shall be displayed as designated by CARRIER in accordance with Applicable Law. CONTRACTOR agrees to keep the Equipment free of any paint, decals, or other items that, in CARRIER's reasonable judgment, would interfere with this identification or be otherwise offensive. CARRIER shall have the right to place and maintain on the Equipment CARRIER's name and any lettering, advertisement, slogans or designs as CARRIER may choose. CONTRACTOR shall remove the identification at the termination of this Agreement or while operating the Equipment on behalf of any other carrier pursuant to the Addendum for Alternative Uses of Equipment or for any

6

purpose other than conducting CARRIER's business. CONTRACTOR further agrees to keep the Equipment in clean appearance and identified as described herein, at CONTRACTOR's expense. CARRIER agrees that CONTRACTOR may display CONTRACTOR's name and address on the Equipment where required by Applicable Law.

***

(i) That CONTRACTOR holds full legal title or that it has the legal right to exercise full control over the Equipment and services to CARRIER, that the Equipment is in good repair and operating condition, that it meets all Applicable Law (as defined in Section 2(c) of this Agreement), that it is in all respects fit and serviceable for the use intended under this Agreement, and that CONTRACTOR is the Equipment's "owner," as that term is defined by 49 C.F.R. § 376.2(d).

(j) No Guarantees or Limitations. CARRIER does not guarantee any specific number of shipments or amount of revenue or profit to CONTRACTOR or to use the Equipment at any particular time or location during the term of this Agreement. CONTRACTOR is free to accept or reject any specific shipment offered by CARRIER. CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an addendum and drivers not used to service this Agreement, to other motor carriers. Nor is CONTRACTOR, consistent with the Addendum for Alternative Uses of Equipment, prohibited from using the Equipment for the pick-up, transportation, or delivery of property for more than one motor carrier or any other person or entity.

(*Id.*, at 23-24).

Paragraph 4 of the Agreement provides:

**PERSONNEL.** CONTRACTOR agrees:

(a) To furnish drivers and all other necessary labor to perform all of the work necessary for:

(i) The transportation of such commodities as CARRIER provides for in its tariffs, schedules and contracts; and

(ii) The loading and unloading of such commodities as CARRIER provides for in its tariffs, schedules and contracts;

(b) That CONTRACTOR's workers will perform loading and unloading at no additional compensation unless otherwise indicated in Addendum A.

7

(c) That CONTRACTOR's drivers will meet and satisfy the driver qualifications of CARRIER, the DOT and the appropriate states, and only those personnel may operate the Equipment furnished CARRIER under this Agreement.

(d) That CONTRACTOR and all personnel furnished or used by CONTRACTOR, including drivers, drivers' helpers and laborers, are the employees or independent contractors of CONTRACTOR.

(e) TWIC Requirement.  CONTRACTOR shall ensure that each of CONTRACTOR's drivers obtains a Transportation Worker Identification Credential ("TWIC") from the Transportation Security Administration of the U.S. Department of Homeland Security if necessary for CONTRACTOR to access ports or other locations in connection with services under this Agreement.  If a CONTRACTOR's driver lacks a TWIC when dispatched by CARRIER to make a pickup or delivery at a port and therefore needs a suitably-credentialed escort, CONTRACTOR shall pay the fee charged by the escort.

(*Id.*, at 24).

Paragraph 5 of the Agreement states, "CONTRACTOR is not obligated to personally (if applicable) perform any of the services contemplated by this Agreement." (*Id.*).

Paragraph 7(d)(i) of the Agreement states that, in part: "CONTRACTOR shall ensure that all of CONTRACTOR's drivers or other workers (A) drive or otherwise perform in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported[.]"  (*Id.*, at 26-27).

In paragraph 8, in bold lettering, the Agreement further provides:

As indicated in Sections 3(e), 10, and 18 of this Agreement, CONTRACTOR—as an independent contractor, not an employee—agrees to pay all of CONTRACTOR's operating expenses (including but not limited to those that CARRIER initially advances and later charges back to CONTRACTOR) out of the gross compensation provided under this Section and Addendum A and any other CONTRACTOR assets.  Under no circumstances shall CARRIER be responsible for these operating expenses.

8

(*Id.*, at 28).

Paragraph 10(a) of the Agreement related to "operating expenses," and provides:

CONTRACTOR shall, at CONTRACTOR's expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, and State base plates, and shall furnish all lubricants, fuel, tires (including changing or repairing tires), and other parts, supplies, equipment, and repairs necessary for the safe and efficient operation and maintenance of the Equipment. CONTRACTOR shall, at CONTRACTOR's expense, be responsible for all expenses incident to the operation of the Equipment, including, but not limited to, empty mileage, lumper expenses, all road taxes, mileage taxes, base plates, highway use taxes, weight taxes, States property or indefinite situs taxes, registration fees, base plates, and licenses (and any unused portions of the fees, plates, or licenses), Native American tribal fees and other permits of all types, ferry, bridge, tunnel, and road tolls, detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation, and wages and other remuneration of drivers, drivers' helpers, and other personnel engaged by CONTRACTOR, workers' compensation insurance (or, to the extent permitted by Section 11(b)(iii) of this Agreement, occupational accident insurance), unemployment insurance, payroll taxes, and employee benefits for these personnel. CARRIER may advance, upon CONTRACTOR's request, and deduct or otherwise recover pursuant to Section 18(b) of this Agreement from CONTRACTOR's settlements or Escrow Fund for any amount involved in such trips from CONTRACTOR and incurred by CARRIER on CONTRACTOR's behalf.

(*Id.*, at 29).

Paragraph 11(b) related to "insurance obligations" of Truckin Right and states, in part:

(i) Non-Trucking Insurance. The CONTRACTOR agrees at its cost to carry non-trucking liability insurance with respect to public liability and property damage to CONTRACTOR whenever the Equipment (including any CARRIER Trailer) is not being operated on behalf of or in the business of CARRIER (including, but not limited to, whenever the Equipment is being operated on behalf of others pursuant to an alternative use of

9

Equipment, as set forth in the Addendum for Alternatives Uses of Equipment, or whenever the Equipment is being operated on behalf of CONTRACTOR alone). The coverage must meet the specifications listed in Addendum B and be no less comprehensive than the non-trucking liability insurance CARRIER may facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses. In addition, the required coverage shall be primary and non-contributory to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

***

v) Other Insurance. In addition to the insurance coverages required under this Agreement, it is CONTRACTOR's responsibility to maintain any fire, theft, uninsured and/or underinsured motorist, physical damage (collision) to CONTRACTOR's Equipment (including any trailer owned or leased by CONTRACTOR), physical damage (collision) to CARRIER's Trailing Equipment, or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs. As provided in Section 12(a) of this Agreement, CONTRACTOR holds CARRIER and its affiliates, subsidiaries, officers, agents, and employees harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property. CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under the law of the State set forth in Section 5(a) of Addendum B (the State in which CARRIER's insurance policies are delivered), and CONTRACTOR shall cooperate in the completion of all necessary documentation for the waiver, election, rejection, or reduction.

(*Id.*, at 32, 34).

Paragraph 22(b) of the Agreement also states that "nothing in this Agreement prohibits CONTRACTOR from providing transportation services for other motor carriers, brokers, directly for shippers, or any other person or entity," provided that the

independent contractor comply with certain federal regulations and other requirements. (*Id.*, at 42-43).

Paragraph 25 of the Agreement states:

**INDEPENDENT CONTRACTOR**

**a. In General.** The parties intend to create by this Agreement between CARRIER and CONTRACTOR the relationship of CARRIER and INDEPENDENT CONTRACTOR and not an EMPLOYER and EMPLOYEE relationship. It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and drivers services provided pursuant to this Agreement.

**b. CONTRACTOR's Workers.** Subject only to all Applicable Law and safety considerations, CONTRACTOR hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, State and federal taxes, fringe benefits, workers' compensation insurance (or, if CONTRACTOR prefers and the requirements of Section 11(b)(ii) of this Agreement are met, occupational injury/employer's liability insurance), adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of CONTRACTOR's use or employment of drivers, drivers' helpers, and other workers to perform any aspect of this Agreement. Each such worker shall be paid and otherwise treated by CONTRACTOR as CONTRACTOR's employee, including CONTRACTOR's reporting of such worker's pay to the IRS on IRS Form W-2, and no such worker shall be considered CARRIER's employee. CONTRACTOR shall be solely responsible for complying with all Applicable Law applicable to the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the CONTRACTOR purchases a license; proof of payment of income; unemployment; Medicare and other State and federal payroll taxes; and other required withholdings for CONTRACTOR's employees. CONTRACTOR's performance of these responsibilities shall be considered proof of CONTRACTOR's status as an independent contractor in fact.

(*Id.*, at 43-44).

Finally, on page 29 of the Agreement, directly above the parties' signature blocks, it states:

> By signing below, CONTRACTOR acknowledges that, as reflected in the terms of this Agreement:
> • CONTRACTOR is NOT an employee of CARRIER, and all aspects of the relationship between CONTRACTOR and CARRIER are based on CONTRACTOR's status as an independent contractor;
> • CONTRACTOR has agreed to be responsible for the operating expenses incurred in connection with CONTRACTOR's business operations;
>
> ***
>
> • The gross compensation paid to CONTRACTOR is MORE than CARRIER would pay an employee to perform professional driving services, which reflects the reality of the marketplace, in that CARRIER cannot attract contractors willing to take the entrepreneurial risk of funding and running their own businesses by paying merely the personal-services wage that they could get as employees.

(*Id.*, at 49).

### C. Truck Lease

On March 6, 2019, plaintiff, through his company, entered into a lease agreement with G.R. Equipment, Inc. ("G.R.") to rent a 2020 Kenworth semi-truck ("the Truck"). (Doc. 29-1, at 9-10; 40-1, at 16-18). G.R. is a wholly owned subsidiary of Hirschbach, Inc., of which defendant is also a wholly owned subsidiary. (Docs. 40-2, at 3; 45, at 3-4). The lease agreement provided that plaintiff need not lease a truck through G.R. to act as an independent contractor for defendant. (Docs. 29-1, at 10; 40-1, at 18).

### D. Plaintiff's Performance of Services

Defendant paid plaintiff for trucking services, usually on a weekly basis, by paying him gross compensation based on a per mile or percentage basis, after deducting expenses such as lease payments for the Truck and for fuel. (Docs. 29-1, at 10, 12; 40-1, at 19–

12

20, 23). Defendant did not pay plaintiff a base salary; defendant paid plaintiff only for loads he hauled. (Docs. 29-1, at 13; 40-1, at 24). Defendant did not withhold payroll taxes from payments made to plaintiff and issued plaintiff Form 1099s, payable to plaintiff or his company, not Form W-2s. (Docs. 29-1, at 11; 40-1, at 21).[1] At first, defendant paid plaintiff on a per mile basis. (Docs. 29-1, at 10; 40-1, at 20). Later, the Company modified this arrangement to pay plaintiff a percentage of the amount the customer paid defendant. (Docs. 29-1, at 10-11; 40-1, at 20). Plaintiff viewed the percentage basis as more favorable to him and he made more money under that arrangement. (Docs. 29-1, at 11; 40-1, at 20). Defendant did not provide plaintiff with sick leave, vacation time, insurance benefits, or retirement benefits. (Docs. 29-1, at 11; 40-1, at 21).

Defendant attests that it hired both employee drivers and contract drivers to drive loads for it; approximately 90% of the drivers were contract drivers. (Doc. 40-1, at 17). Plaintiff testified that he drove for defendant as an independent contractor and not as an employee because it was the style of freight hauling that he had been used to prior to coming to drive for defendant, he believed he "did much better" financially as an independent contractor, and it allowed him the ability to refuse to accept driving assignments if he chose. (Doc. 29-1, at 13). Defendant's employee drivers are expected to follow precise driving routes and satisfy certain attendance expectations and driving metrics. (Doc. 29-1, at 13; 40-1, at 25). Employee drivers did not provide their own trucks, and defendant paid for fuel and maintenance on fleet trucks driven by employee drivers. (Docs. 29-1, at 14; 40-1, at 25).

---

[1] Plaintiff asserts the 2019 1099 was issued to Richard Shearer d/b/a Truckin Right, LLC, while the 2020 1099 was issued to both Richard Shearer and Truckin Right, LLC, without a "d/b/a" designation. (Doc. 40-1, at 21).

Defendant provided plaintiff with proposed driving routes, but it was plaintiff's "choice to an extent" on how he delivered loads and he did not travel to locations that were in his "black book." (Docs. 29-1, at 11; 40-1, at 21–22). Plaintiff was free to, and did on occasion, turn down or decline to haul loads. (Docs. 29-1, at 12; 40-1, at 23). Plaintiff was free to have another person drive the Truck he rented from G.R. (Docs. 29-1, at 12; 40-1, at 23). Plaintiff hauled loads for defendant "all over the country," driving so frequently that he lived out of his truck and did not have a permanent residence. (Docs. 29-1, at 12; 40-1, at 22). Plaintiff chose when to stop and take breaks or eat while driving loads for defendant. (Docs. 29-1, at 12; 40-1, at 23). Defendant did not require plaintiff to meet specific performance metrics, such as driving a certain number of miles each week. (Docs. 29-1, at 13; 40-1, at 24).

The Truck was equipped with a GPS tracking device, as required by the Department of Transportation. (Docs. 40-2, at 10; 45, at 12). Plaintiff asserts it allowed the Company to know where the Truck was at any given time. (Doc. 40-3, at 26).

The Truck had to be "placarded" to identify it "Hirschbach Motor Lines, Inc.," under whose authority plaintiff drove it, as required by federal law. (Docs. 40-2, at 10–11; 45, at 13-14).

### E. Plaintiff's Interactions with Gatena

Gatena became involved in planning plaintiff's over-the-road freight loads beginning in November 2019. (Docs. 40-2, at 12; 45, at 16). At that time, she was Senior Director of Fleet Management. (Docs. 40-2, at 13; 45, at 16-17). In that position, she was responsible for oversight of twelve to fifteen driver managers and effective utilization, retention of the truck drivers under her oversight. (Docs. 40-2, at 14; 45, at 19). Gatena believed she had the authority to terminate plaintiff's relationship with defendant. (Docs. 40-2, at 13; 45, at 17). Lyndi Curry or Dan Wallace were her direct supervisors. (Docs. 40-2, at 14; 45, at 19). She was demoted on August 3, 2020, to a

14

driver manager because of her "unacceptable performance" on matters unrelated to sexual harassment. (Docs. 40-2, at 15; 45, at 20).

Early in plaintiff's driving for defendant he fell behind in lease payments for the Truck. (Doc. 29-1, at 14). Gatena offered to "plan [him] nonstop" with driving opportunities to help him catch up on his lease payments. (Docs. 29-1, at 14; 40-1, at 26). By March 4, 2020, plaintiff had caught up on his lease payments. (Docs. 29-1, at 14; 40-1, at 26). In about January 2020, plaintiff's relationship with Gatena turned sexual. (Docs. 29-1, at 14; 40-1, at 27). Sometime after that, Gatena removed plaintiff from the class of drivers paid by the mile and placed him in the so-called "504 cost center" where he was paid a percentage of the gross pay per load, even though he was not technically qualified to participate in that program. (Docs. 40-2, at 19–20; 45, at 29-31). This pay arrangement was financially more lucrative for plaintiff. (Docs. 40-2, at 20; 45, at 31). Defendant could have discovered this impropriety by reviewing its internal records. (Docs. 40-2, at 22-23; 45, at 34-36).

Plaintiff did not talk to anyone at the Company about his sexual relationship with Gatena until he reported it to Wallace on November 2, 2020. (Docs. 29-1, at 14-15; 40-1, at 27-28). At that time, plaintiff alleged Gatena was sexually harassing him. (Docs. 29-1, at 14; 40-1, at 27). Wallace and other officers at the Company participated in a conference call with plaintiff about his complaint. (Docs. 29-1, at 15; 40-1, at 28). Defendant initiated an investigation into the allegation and placed Gatena on administrative leave. (Docs. 29-1, at 15; 40-1, at 28). At first Gatena denied having a sexual relationship with plaintiff, but soon admitted it to Wallace. (Docs. 29-1, at 15; 40-1, at 28). Gatena stated that plaintiff had engaged in threatening conduct toward her and that she was scared for her safety. (Docs. 40-1, at 35; 45, at 18). On November 4, 2020, defendant terminated Gatena's employment because of her misconduct toward plaintiff, because she lied about her relationship with him initially, and because she was

already on a "final disciplinary warning" at the time for conduct unrelated to sexual harassment.  (Docs. 29-1, at 15; 40-1, at 28–29).

### F.    Plaintiff's Driving for Defendant After Reporting Sexual Harassment

After plaintiff notified defendant of Gatena's sexual harassment, Gatena had no further contact with plaintiff as defendant's employee.  (Docs. 29-1, at 16; 40-1, at 29).  Defendant assigned Lisa Breen ("Breen") to assume planning duties for plaintiff's loads.  (Docs. 29-1, at 16; 40-1, at 29).   Breen was unaware that plaintiff had made sexual harassment complaints against Gatena; she was aware only that Gatena had been fired for having an inappropriate relationship with an unidentified driver.  (Docs. 29-1, at 16; 40-1, at 29).   Plaintiff also began experiencing panic attacks prompting him to visit emergency rooms on two occasions.  (Docs. 40-2, at 24-25; 45, at 39).   Plaintiff's medical condition impaired to some degree his ability to drive the Truck and deliver loads.  (Docs. 40-2, at 25; 45, at 40-41).  In November 2020, plaintiff's gross and net pay decreased.  (Docs. 40-2, at 24; 45, at 38-39).

In his deposition, plaintiff testified that he had no reason to believe Breen treated him differently than any other drivers whose routes she planned.  (Doc. 40-3, at 37).  Plaintiff testified, however, that he believed that someone "higher than" Breen in the Company's organization directed Breen to give plaintiff less favorable treatment and opportunities.  (*Id.*).  Plaintiff admitted that he did not "have any proof of that" but that it was his belief.  (*Id.*).  Plaintiff asserted that after Breen began planning his routes, plaintiff suffered a loss of income.  (*Id.*).  Plaintiff assumed that the difference in pay was the result of retaliation.  (*Id.*).  Shortly after Breen took over planning plaintiff's routes, plaintiff failed to deliver multiple loads offered to him because he reported being sick.  (Docs. 29-1, at 16-17; 40-1, at 32;  29-2, at 75).  After two such instances, Breen determined that defendant could not offer plaintiff more loads until she knew he could complete them.  (Docs. 29-1, at 16-17; 40-1, at 33).

16

On November 20, 2020, plaintiff sent a letter to defendant tendering his "formal resignation as a lease operator for" defendant. (Docs. 29-1, at 17; 40-1, at 33). Plaintiff also had contact with Brian Kohlwes, defendant's General Counsel and Chief Risk Officer. (Docs. 29-1, at 17; 40-1, at 33; 40-3, at 59). Plaintiff informed Kohlwes that plaintiff had retained counsel and could not further speak with Kohlwes. (Doc. 29-1, at 17; 40-1, at 33). After speaking with Kohlwes, plaintiff began driving the Truck back from Council Bluffs, Iowa, where he had sought medical treatment for a panic attack, to defendant's headquarters in Dubuque, Iowa. (Docs. 29-1, at 17; 40-1, at 33-34). Plaintiff testified that Breen had told him to return the Truck to Dubuque. (Doc. 40-3, at 39, 53). Breen testified that her "recollection is the opposite" and she "was uncomfortable speaking with [plaintiff] by then because of some of the things that had gone outside of it with [Gatena] and him, and also with just the tone he took when [she] spoke with him around that time." (Doc. 40-3, at 126). When plaintiff reached Anamosa, Iowa, he stopped to seek medical attention again for a panic attack, for which he was prescribed medication. (Docs. 29-1, at 18; 40-1, at 34). Plaintiff parked the Truck in a WalMart parking lot, waiting for the pharmacy to open so he could fill his prescription. (Docs. 29-1, at 18; 40-1, at 34).

After plaintiff began to drive the Truck to Dubuque, Kohlwes testified he became aware that plaintiff had just been treated for some mental issues, had checked himself into a hospital, and was on some sort of medication, but defendant did not know the type of medication. (Doc. 40-3, at 61). Kohlwes testified there were also concerns raised that plaintiff may be coming to Dubuque to harm Gatena or someone. (*Id.*). Because of plaintiff's mental health issues, prescription of an unknown medication for plaintiff, and statements by Gatena about plaintiff's threatening conduct toward her, Kohlwes contacted Anamosa Police to have plaintiff removed from the Truck. (*Id.*, at 62). Anamosa police officers removed plaintiff from the Truck at gunpoint. (*Id.*, at 9).

### G. Knowledge of Sexual Relationships Among Defendant's Employees

Gatena was married at the time she worked for defendant. (Doc. 31, at 96-97). In her deposition, Gatena admitted to having sex with a coworker, N.S., and stated another female employee was present in the room one time where they engaged in sex. (*Id.*, at 96-97). Gatena also admitted in her deposition to having sex with a driver for defendant, E.O. (*Id.*, at 97). Gatena has since sued defendant claiming that other male employees had sexual relationships with other employees and were not fired. (Doc. 29-2, at 48).

N.S. admitted having an on-again, off-again sexual relationship with Gatena for about one and half years while they were both employed with defendant. (Doc. 31, at 117). N.S. testified that he had sexual relationships with seven or eight co-workers while working for defendant, in addition to his sexual relationship with Gatena. (*Id.*). At least two other mid-level or executive-level employees of defendant knew about his sexual relationships with other co-workers. (*Id.*, at 117-18).

Gatena told plaintiff that she had sexual relationships with other coworkers, including N.S., and with customers. (Doc. 31, at 4, 96–97). In his deposition, plaintiff testified that Gatena told him about conversations she had with two of defendant's employees. (Doc. 29-2, at 10, 32). Based on what Gatena told him, plaintiff believes that these two employees, Breen and N.S., were aware of Gatena's sexual relationship with plaintiff. (Docs. 29-1, at 19; 40-1, at 38–39). Gatena told plaintiff that she communicated with N.S. via electronic messaging in September 2020, during which N.S. asked her why plaintiff was receiving so many superior loads and inquired whether they were sleeping together; when she told him to mind his own business, N.S. said "I knew it." (Doc. 31, at 5). According to N.S., his comment was an off-color joke and that he did not "seriously wonder" whether plaintiff and Gatena were engaged in a sexual relationship. (Doc. 29-2, at 80).

Breen was aware that Gatena had a sexual relationship with E.O. (Doc. 31, at 114). Breen testified in her deposition that Gatena had told her that Gatena had an inappropriate incident with plaintiff, that something "went too far," but Gatena denied sleeping with plaintiff. (*Id.*). Breen understood that from Gatena's perspective it went too far because Gatena was married. (Doc. 29-2, at 74).

Another employee, Lyndi Curry, one of Gatena's supervisors, had heard rumors of Gatena's past extramarital affairs, but had no personal knowledge of them. (Doc. 40-3, at 134).

Plaintiff is not aware of any other drivers with whom Gatena had a sexual relationship. (*Id.*, at 20).

## II.   *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v.*

*Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. The plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Even so, the moving party does not meet its burden by simply providing a massive record, and the Court "will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

The moving party's burden of production turns on its burden of persuasion at trial. If the moving party bears the burden of persuasion on the relevant issue at trial, it must support its motion with credible evidence available under Rule 56(c) that would entitle it to a directed verdict if not challenged at trial. *Celotex Corp.*, 477 U.S. at 331; *Firemen's*

20

*Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). But, if the moving party does not bear the burden of persuasion at trial, it has two options to satisfy its Rule 56 burden of production. First, it may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Second, it may show that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d at 996.

Once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and show by depositions, affidavits, or other evidence "specific facts which create a genuine issue for trial." *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation marks omitted). In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## III.   DISCUSSION

Plaintiff sued defendant in a five-count complaint. (Doc. 1). Specifically, in Count 1, plaintiff alleged sexual harassment under the Iowa Civil Rights Act ("ICRA") and in Count 2 retaliation under the ICRA. (*Id.*). In Count 3, plaintiff alleged sexual harassment under Title VII of the Civil Rights Act of 1964, and in Count 4 retaliation

under that same statute. (*Id.*). In Count 5, plaintiff alleged a state common law claim of negligent hiring, retention, and supervision. (*Id.*). In defendant's brief in support of its motion, defendant argues it is entitled to judgment as a matter of law on Counts 1 through 4 because, as an independent contractor, plaintiff is not eligible for relief on his harassment and retaliation claims under both Iowa and federal law. (Doc. 33, at 4-16). Alternatively, defendant argues that it is also entitled to judgment on plaintiff's retaliation claims in Counts 2 and 4 because there is no evidence of an adverse employment action taken as a result of him complaining of sexual harassment. (*Id.*, at 16-24). Last, defendant argues that it is entitled to judgment on plaintiff's negligent hiring, retention, and supervision claim in Count 5 because there is no evidence defendant knew or should have known Gatena would sexually harass plaintiff. (*Id.*, at 24-31). The Court will address each ground for summary judgment in turn.

### A. Whether Plaintiff Was an Independent Contractor

The viability of plaintiff's first four counts of his complaint turn on whether he was defendant's employee or an independent contractor. Plaintiff claims sexual harassment and retaliation under both the ICRA and Title VII. Both statutes protect employees but not independent contractors. *See Wortham v. Am. Fam. Ins. Grp.*, 385 F.3d 1139, 1141 (8th Cir. 2004).

In determining whether a person is an employee or an independent contractor, the Supreme Court applies the general common law of agency to determine whether a hired party is an employee or an independent contractor. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-25 & n.3 (1992). In applying this test, the Supreme Court has instructed lower courts to consider a nonexhaustive list of factors ("*Reid* factors") derived primarily from the Restatement (Second) of Agency § 220(2) (1958):

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.

22

Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. . . . No one of these factors is determinative.

*Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 751-752 (1989) (footnotes omitted); *see also Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480, 483-84 (8th Cir. 2000) (applying in a sexual discrimination case the nonexhaustive list of factors identified in *Darden*). The right to control, however, is a "primary consideration." *Schwieger*, 207 F.3d at 484. A district court may also properly consider economic aspects of the parties' relationship. *See Wilde v. Cty. of Kandiyohi*, 15 F.3d 103, 106 (8th Cir. 1994). Likewise, the terms of any written agreement between the parties is also important. *See Wortham*, 385 F.3d at 1140; *Glascock v. Linn Co. Emergency Med., PC*, 698 F.3d 695, 698 (8th Cir. 2012). This analysis "requires more than simply tallying factors on each side and selecting the winner on the basis of a point score." *Schwieger*, 207 F.3d at 487. Whether a hired party is an independent contractor or employee is an appropriate question for summary judgment. *Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 488 (8th Cir. 2003).

In weighing these factors, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Darden*, 503 U.S. at 324 (quotation omitted); *see also Hunt v. Missouri*, 297 F.3d 735, 741 (8th Cir. 2002). In balancing the factors, a court must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of "indeterminate" weight—that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either the conclusion

23

that the worker is an employee or the conclusion that the worker is an independent contractor. *See Aymes v. Bonelli*, 980 F.2d 857, 861, 863 (2d Cir. 1992). The Court will address each of the factors as they pertain to plaintiff's relationship with defendant.

### 1. *Plaintiff's Control Over Tasks*

The first factor the Court must consider is the degree to which plaintiff had the ability to and did control the tasks of his job. Under the Agreement, plaintiff had the ability to exercise control over the essential tasks of his work. He could accept or reject driving assignments, employ other drivers or assistants, decide when he would stop and take breaks, choose his route, work the hours he chose, and drive for other companies. The record is less clear as to whether plaintiff in fact exercised the control he theoretically was authorized under the terms of the Agreement. *See, e.g.*, *Berger Transfer & Storage v. Cent. States, S.E. & S.W. Areas Pension Fund*, 85 F.3d 1374, 1379-80 (8th Cir. 1996) (stating that truck owner-operators who drove for more than one company were independent contractors, and recognizing that whether the worker actually exercises control is important). Here, the record shows that plaintiff did control which loads he chose to drive and rejected some. It also fairly supports the conclusion that he chose his own routes and did not feel bound by defendant's recommended routes. The record further fairly supports the conclusion that plaintiff chose his own hours and when to take breaks while driving. It does not appear, however, that plaintiff ever in fact hired others to drive with him or assist him, or that he ever in fact drove for another company while working for defendant.

Plaintiff argues that defendant controlled his work because it was able to track him through a GPS unit on the Truck. (Doc. 42, at 14). The Truck was equipped with a GPS unit, but it was required by law. More importantly, there is nothing in the record showing that defendant used that GPS device to restrict plaintiff from exercising control over the way he performed the task of driving loads for defendant. For example, the

record does not support that defendant used the GPS information to dictate or change routes chosen by plaintiff, or monitor where or when he took breaks or otherwise performed his work. The fact that defendant could monitor plaintiff's whereabouts through GPS does not mean that it controlled plaintiff through GPS.

Thus, on balance the Court finds this consideration weighs in favor of finding plaintiff was an independent contractor and not an employee.

### 2. Skill Required

The skill required to perform the task is the first of several other factors that may apply. For example, courts have held that the level of skill associated with being an architect, computer programmer, graphic artist, photographer, or treasurer suggests that workers who perform these jobs are independent contractors. *See Aymes*, 980 F.2d at 862 (collecting cases). Here, plaintiff was required to and did possess a commercial driver's license that he obtained independent of and before he began driving for defendant. (Docs. 29-1, at 1; 40-1, at 2). That is some evidence plaintiff was an independent contractor because his "job required particular skills beyond those taught by a specific employer and, indeed, required skills that would have permitted [plaintiff] to work independently of any employer-employee relationship." *Smith v. Mut. of Omaha Ins. Co.*, No. 4:17-CV-00443-JAJ, 2019 WL 13129389, at *10 (S.D. Iowa May 1, 2019). Yet, as plaintiff points out, employee drivers were also required to have commercial driver's licenses. (Doc. 42, at 16). In this particular industry, therefore, whether a driver has a special skill as reflected in a commercial driver's license is not informative about whether the driver is an employee or an independent contractor.

Thus, the Court finds this factor is in equipoise and neither weighs in favor or against finding plaintiff was an independent contractor.

25

### 3. *Source of Instrumentalities and Tools*

When a worker supplies his own instrumentalities of and tools for work performed, the worker is more likely to be found to be an independent contractor and not an employee. *See Hanson v. Friends of Minn. Sinfonia*, 181 F. Supp.2d 1003, 1008 (D. Minn. 2002) (finding that musician's provision, maintenance of, and insurance for their musical instruments made them more like independent contractors). Here, the principal instrumentality was the Truck. Plaintiff rented the Truck from defendant's affiliate company, with the lease payments deducted from plaintiff's pay. Plaintiff paid for maintenance and insurance for the Truck. Plaintiff also paid his own fuel costs. All this makes plaintiff more of an independent contractor than employee. *See Velazquez v. Corp. Transit of Am.*, No. 8:16-cv-00948-T-27-AEP, 2016 WL 10537597, at *3-*4 (M.D. Fla. Dec. 19, 2016) (finding worker's provision of truck and paying for insurance consistent with independent contractor status). That plaintiff leased the Truck from another wholly-owned subsidiary of defendant's parent company does not negate the fact that he provided the Truck and was responsible for lease payments, especially when he was not required to lease the Truck from G.R. *See Taylor v. BP Exp., Inc.*, No. CV 407-182, 2008 WL 5046071, at *1, 4 (S.D. Ga. Nov. 24, 2008) (finding worker's rental of truck from company, and paid for all expenses for operating the truck, such as fuel and maintenance, weighed in favor of finding the worker an independent contractor).

Plaintiff asserts that defendant required him under the contract to lease the Truck through G.R, another wholly-owned subsidiary of defendant's parent company, dictated the placards on the Truck, required plaintiff to go through defendant for maintenance, and required its approval for plaintiff to change equipment. (Doc. 42, at 11). Plaintiff did lease the Truck through G.R., but he was not required to do so under the contract. The placards were required by law, and regardless had no impact on how plaintiff performed his work. Further, although in practice plaintiff participated in defendant's

26

maintenance program that directed him to defendant-approved facilities for repairs to the Truck, he was not required to do so and was ultimately responsible for repairs. (Docs. 31, at 23-24; 40-3, at 23). In short, to the extent that defendant was involved in the leasing and maintenance on the Truck, it was a matter of choice by plaintiff.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an independent contractor and not an employee.

### 4. *Location of Work*

Plaintiff's location of work was on the road. Indeed, he traveled so much that he had no permanent residence and lived out of his truck. Plaintiff was not subject to in-person supervision in the performance of his driving tasks. This is not a case, in other words, where plaintiff worked at defendant's physical facility subject to oversight. *Compare Glascock*, 855 F. Supp.2d at 869 (finding that worker's location of work at a hospital and not at defendant's office weighed in favor of finding worker was independent contractor) *and Schwieger*, 207 F.3d at 485-86 (finding that worker working "almost entirely out of her own office facility and in the field and was not subject to physical supervision in the performance of her daily tasks" weighed in favor of finding that she was an independent contractor), *with Farrell v. Finchum Sports Floors*, No. 3:14-CV-565-CCS, 2018 WL 283247, at *4 (E.D. Tenn. Jan. 3, 2018) (finding that worker's requirement of having to report "into the office three to five days per week" weighed in favor of finding the worker was an employee).

Thus, the Court finds this factor weighs in favor of finding plaintiff was an independent contractor and not an employee of defendant.

### 5. *Duration of the Relationship*

This factor is inapplicable here or is, at most, in equipoise. There is nothing about the length of the relationship between the parties that strongly militates for or against finding an employer/employee versus employer/independent contractor relationship.

Were the duration only a few weeks or months, the Court might find it more suggestive of an independent contractor relationship. *See Gray v. FedEx Ground Package System, Inc.*, 799 F.3d 995, 1001 (8th Cir. 2015) (noting that independent contractors are typically hired to complete a specific task). On the other hand, a duration of five years or more is more suggestive of an employer/employee relationship. *See Schwieger*, 207 F.3d at 485 (finding ten-year duration indicative of employer/employee relationship); *Walsh v. Alpha & Omega USA, Inc.*, 553 F. Supp.3d 659, 672 (D. Minn. 2021) (finding renewed driver contracts where some drivers worked for the company for more than five years favors employee status). Here, the duration was a year and a half, a time duration that is not informative as to the parties' relationship.

Thus, the Court finds this factor does not weigh in favor of finding plaintiff was an independent contractor or an employee of defendant.

### 6. Defendant's Assignment of Additional Work

This factor is inapplicable here or is, at most, in equipoise. Although the Agreement authorized plaintiff to hire others to assist him in the performance of his work, that was a theoretical authority that was not exercised in practice. That plaintiff could have assigned work to others, but never did, does nothing to inform the Court as to the true nature of his working relationship with defendant. The mere fact that a worker has an ability to do something does not make that worker more likely to be an independent contractor.

Thus, the Court finds this factor does not weigh in favor of finding plaintiff was an independent contractor or an employee of defendant.

### 7. Plaintiff's Control Over Time and Hours

Plaintiff controlled his own time and hours. He, unlike defendant's employee truck drivers, was not bound by metrics dictating his hours or other aspects of his job performance. This, again, is evidence of an independent contractor relationship, not an

employer/employee relationship. *See Berger*, 85 F.3d at 1378–79 (affirming district court finding that workers' ability to control when and how long they worked was consistent with independent contractor status). Plaintiff argues that the contract required him to make on-time deliveries and meet pickup and delivery schedules, and any choice he made in his routes he made to assure the on-time deliveries. (Doc. 42, at 13). That may be so, but the fact remains that plaintiff was free to choose his own routes, set his own hours, and determine his own breaks when he accepted a load to deliver.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an independent contractor and not an employee.

### 8.    *Method of Payment*

When a worker is paid by job or a percentage rather than by the hour or by salary, it is more consistent with an independent contractor than with being an employee. *See Darden*, 503 U.S. at 323-24; RESTATEMENT (SECOND) OF AGENCY § 220(2). Here, plaintiff was at first paid by the mile and later more lucratively by percentage of what defendant was paid by its customers. He was not paid by the hour or on salary, and was not provided sick leave, vacation time, or retirement benefits.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an independent contractor and not an employee.

### 9.    *Plaintiff's Role in Hiring and Paying Assistants*

This factor, like the factor of assigning work, is inapplicable here or is, at most, in equipoise. Although the Agreement authorized plaintiff to hire others to assist him in the performance of his work, that was a theoretical authority that was not exercised in practice. That plaintiff could have hired others to assist him, but never did, does nothing to inform the Court as to the true nature of his working relationship with defendant. Again, the mere fact that a worker has an ability to do something does not make that worker more likely to be an independent contractor.

Case 2:21-cv-01014-CJW-MAR   Document 49   Filed 06/28/22   Page 29 of 46

Thus, the Court finds this factor does not weigh in favor of finding plaintiff was an independent contractor or an employee of defendant.

### 10. Defendant's Regular Business

Defendant's regular business is trucking. It has truckers on its payroll for whom it provides trucks, fuel, maintenance, etc.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an employee and not an independent contractor.

### 11. Whether Defendant is in Business

The case law provides little or no elaboration on what the factor of whether the hiring party is "in business" means. *See, e.g.*, *Weary v. Cochran*, 377 F.3d 522, 525 n.1 (6th Cir. 2004) (noting that the parties agreed that this factor was irrelevant because "almost any hiring party is in business"). Defendant urges that this factor weighs in favor of finding plaintiff was an independent contractor because defendant "elects to do business with organized business entities—not individuals" as reflected in its hiring of Truckin Right as opposed to contracting with plaintiff as an individual. (Doc. 33, at 13). Whatever this factor means, it does not mean that. Defendant's analysis conflates the focus on whether plaintiff was in business instead of whether defendant—the hiring party—was in business. Moreover, the record shows that defendant contracts with independent contractors and has its own employee drivers, so defendant's argument here is inconsistent.

The Court believes that what this factor refers to is whether the hiring party is an individual or a business. In other words, an individual who hires someone to perform a service (e.g., a homeowner who hires a builder to construct a home-addition) is more likely to have an independent contractor relationship with the worker than a business who hires someone to perform a service, particularly when that service is part of the hiring

30

party's business.  Here, defendant is clearly in the trucking business and hired plaintiff to drive trucks as part of defendant's trucking business.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an employee and not an independent contractor.

### 12.    *Provision of Employee Benefits*

Whether the hiring party provides the worker with benefits is often seen as an important factor in the analysis.  "[E]very case since *Reid* that has applied the [common-law] test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes." *Kirk v. Harter*, 188 F.3d 1005, 1008 (8th Cir. 1999) (quoting *Aymes*, 980 F.2d at 863); *see also Birchem v. Knights of Columbus*, 116 F.3d 310, 313 (8th Cir. 1997).  Here, defendant did not provide plaintiff with benefits.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an independent contractor and not an employee.

### 13.    *Plaintiff's Tax Treatment*

How a hiring party treats a worker for tax purposes is often highly informative of whether the worker is an independent contractor or employee.  *See, e.g.*, *Lerohl*, 322 F.3d at 492 (finding it "highly significant" that the hiring party did not withhold FICA taxes and "documented musician payments on an IRS Form 1099").  Here, defendant did not withhold FICA taxes and documented payments to plaintiff on Form 1099s. Plaintiff's retort is that, of course defendant did not issue W-2s to him because it did not want to open itself to the argument he was an employee.  (Doc. 42, at 15).  Plaintiff's retort is irrelevant.  Whatever the motive defendant had, the reality is that plaintiff was treated for tax purposes as an independent contractor.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an independent contractor and not an employee.

31

### 14.    *Economic Realities*

The economic realities factor is one that requires the Court to look beyond the formalities and technicalities of the relationship between the hiring party and the worker to examine how, in reality, the relationship truly worked in practice between the parties. Under the "economic realities" test, a worker is an employee if economically dependent on the business to which he renders service. *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1495 (11th Cir. 1993) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991); *Fraiser v. Gen. Elec. Co.*, 930 F.2d 1004, 1008 (2d Cir. 1991)). "It is a much broader test, primarily for the purpose of determining who is an employer under the broad definition of 'employ' of the Fair Labor Standards Act[.]" *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp.2d 333, 346 (S.D.N.Y. 2009) (citing *Frankel v. Bally, Inc.*, 987 F.2d 86, 89 (2d Cir. 1993)). Here, in practice, plaintiff was economically dependent on defendant. Although he had the right to drive for other companies, in practice he drove only for defendant upon whose driving assignments he was dependent.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an employee and not an independent contractor.

### 15.    *Terms of Agreement*

Although the terms of a written agreement is a factor for a court to consider, it must do so with some caution especially when the defendant drafted the contract. The mere fact that the Agreement designates plaintiff as an independent contractor is not determinative under either federal or Iowa law on the issue of whether he is, in fact, an independent contractor. *See, e.g.*, *Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C. Cir. 1979) (holding that, in determining whether a worker is an employee or an independent contractor, the District Court "rel[ied] principally, if indeed not entirely, on the contract language," and that doing so was error because, inter alia, "employment contracts, no matter what the circumstances that justify their execution or what the terms, may not be

32

used to waive protections granted to an individual under [Title VII] or any other [A]ct of Congress"); *Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 217 (Iowa 1984) (noting the intent of the parties as memorialized in designation of worker as independent contractor is not conclusive in employee–independent contractor determination); *Louismet v. Bielema*, 457 N.W.2d 10, 13 (Iowa Ct. App. 1990) ("If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial.").

Here, the terms of the written Agreement between plaintiff and defendant are explicit in its terms that plaintiff worked for defendant as an independent contractor. The Agreement repeatedly uses the words "independent contractor" to refer to plaintiff and specifically states that he was not an employee of defendant.

Thus, the Court finds this factor weighs in favor of finding plaintiff was an independent contractor and not an employee.

### 16. *Summary*

Although *Reid* and its progeny provide a nonexhaustive list of factors to consider in determining whether a person is an employee or an independent contractor, the parties have not identified any factors other than those the Court has considered here. Keeping in mind that no one factor is determinative and merely counting factors favoring one conclusion versus another is not an appropriate means of reaching an answer, the Court finds the totality of the circumstances weigh in favor of finding plaintiff was an independent contractor and not an employee.

Although the economic realities of plaintiff's relationship with defendant would suggest he was an employee, that factor does not control. Rather, the Court must view that factor in light of the common law principles of agency and plaintiff's right to control the means and manner of his work. *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340-41 (11th Cir. 1982); *Taylor*, 2008 WL 5046071, at *6. Here, defendant provided plaintiff

an opportunity to drive for it, but did not control how plaintiff performed his work. It may have been practically difficult for plaintiff to drive for others while driving for defendant. Nevertheless, plaintiff's decision to drive only for defendant did not transform a relationship that was otherwise one of an independent contractor into an employer/employee relationship.

Thus, the Court finds there is no genuine issue of material fact that plaintiff was an independent contractor working for defendant and, as such, cannot pursue claims of sexual harassment or retaliation as alleged in Counts 1 through 4. Summary judgment must issue, therefore, in favor of defendant on those counts.

### B.     Whether There is Evidence of Retaliation

Defendant argues in the alternative that the Court should grant summary judgment on plaintiff's retaliation claims in Counts 2 and 4 because there is no evidence that defendant took adverse employment action against plaintiff because he complained about sexual harassment. (Doc. 33, at 16-24). In his complaint, plaintiff alleged defendant retaliated against him by assigning him less favorable driving routes and "inferior loads" after he complained about sexual harassment. (Doc. 1, at 12-13, 17-18). Plaintiff argues that a reasonable inference can be made that the decrease in his revenue in November 2020 was a result of his reporting the sexual harassment. (Doc. 42, at 18-20). Plaintiff also argues that the "unnecessary confiscation of [the] Truck at gunpoint" also constituted retaliation. (*Id.*, at 20-21). The Court finds there is no genuine issue of material fact that would support a claim that defendant retaliated against plaintiff because he complained about being sexually harassed. Thus, even if the Court had found plaintiff was defendant's employee, it would grant summary judgment on plaintiff's retaliation claims. The Court will address plaintiff's two theories of retaliation separately.

### 1. *Retaliation by Decreasing Revenue*

Defendant argues that as soon as plaintiff reported Gatena's sexual harassment on November 2, 2020, it fired Gatena and had Breen take over assigning routes to plaintiff. (Docs. 33, at 17; 29-1, at 15; 40-1, at 27). Defendant argues that any revenue reduction plaintiff suffered between that time and his decision to resign on November 20, 2020, was his own fault for failing to perform driving tasks assigned him due to plaintiff's mental health crisis. (Docs. 33, at 17). Plaintiff argues that the change in his income "gives rise to a reasonable inference that he was no longer getting the cherry loads" after he reported Gatena's wrongful conduct. (Doc. 42, at 19).

The Eighth Circuit Court of Appeals has held that the *McDonnell Douglas* burden-shifting framework applies to retaliation claims under Title VII. *Buettner v. Arch Coal Sales, Inc.*, 216 F.3d 707, 713-714 (8th Cir. 2000); *see Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). The first step in this framework is plaintiff's requirement to establish a prima facie case of retaliation. *Buettner*, 216 F.3d at 713–14. To establish a prima facie case of retaliatory discrimination, an employee must establish the following four elements:

> (1) [the employee] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection between participation in the protected activity and the adverse employment action.

*Id.* An employee can demonstrate an adverse employment action by showing "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted). In addition to these requirements, the plaintiff must show that a reasonable person could believe that the alleged incidents would violate Title VII's standard. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268,

271 (2001).  Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to produce some legitimate, non-discriminatory reason for the adverse action.  *See Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980).  If the employer satisfies this burden, the plaintiff must prove the proffered reason is a pretext for retaliation.  *See id.*  Ultimately, the plaintiff must establish the employer's adverse action was based on intentional discrimination.  *See Ryther v. KARE 11*, 108 F.3d 832, 837-38 (8th Cir. 1997) (en banc) (applying the *McDonnell Douglas* burden shifting analysis in an age discrimination case).

Here, plaintiff has made a prima facie case of retaliation.  His report of sexual harassment was activity protected under Title VII.  The assignment of inferior driving routes that affected plaintiff's revenue is an adverse employment action.  *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (finding that actions short of termination, including more adverse work assignments, can constitute adverse employment action).  Last, there is some evidence of a causal connection between plaintiff's complaint of sexual harassment and the assignment of inferior driving routes.  The timing of the adverse employment action—occurring after he reported sexual harassment—could support a conclusion of retaliatory motive.  *See Eliserio v. United Steelworkers of Am.*, 398 F.3d 1071, 1079 (8th Cir. 2005) ("A plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events.").

Defendant, however, has proffered a neutral reason for the assignment of inferior routes, *See Womack*, 619 F.2d at 1296; plaintiff failed to perform on routes assigned him because he was suffering a mental health crisis.  Defendant has also asserted that Breen, who assigned plaintiff his routes, was not told and did not know plaintiff complained of being sexually harassed.  Thus, defendant argues, plaintiff cannot show that Breen's actions were motivated by retaliation for complaining.  Defendant further argues that

36

plaintiff offers only speculation that someone above Breen instructed her to assign plaintiff inferior routes.

In response, plaintiff argues that his first visit to an emergency room for mental health issues did not occur until November 17, 2020; thus, the reduction in his revenue cannot be explained by his need for medical attention. (Doc. 42, at 20). Plaintiff also argues that his need for mental health treatment was a result of the sexual harassment. (*Id.*).

This is a close call, but the Court finds there is no genuine issue of material fact that would preclude entry of summary judgment on the merits of plaintiff's retaliation claims. The record shows that Breen was not explicitly told that defendant complained that Gatena sexually harassed him. True, Breen had some awareness of a relationship between plaintiff and Gatena that was "inappropriate" and was aware that Gatena had past sexual relationships with other employees. (Docs. 31, at 114; 29-2, at 74-75). Breen's supervisor only told her that defendant had terminated Gatena's employment and refused to disclose why, but at some unknown time later Breen learned directly from Gatena that defendant had accused Gatena of having an inappropriate relationship with a driver. (Doc. 29-2, at 77). It is unclear from the record when Breen spoke with Gatena, but if it occurred while Breen was still assigning plaintiff routes, then it could have been reasonable for Breen to conclude that the inappropriate relationship that caused Gatena's firing was between Gatena and plaintiff. *See Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001) (noting that the nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence).

Nevertheless, even if the record supported making that logical leap, what is missing here is evidence that Breen knew that plaintiff had complained about Gatena sexually harassing him. *See Cole v. May Dep't Stores Co.*, 109 Fed. App'x 839, 841 (8th Cir. 2004) (finding no causation when there was no evidence the decision-maker was

37

aware of the employee engaging in protected activity). The inappropriate relationship between Gatena and plaintiff could have been discovered in other ways. Further, there is no evidence in this record supporting the conclusion that Breen was motivated to retaliate against plaintiff even if she somehow became aware that plaintiff had complained of Gatena's sexual harassment. Breen was friendly with Gatena, (Doc. 29-2, at 77), but there is nothing in the record that Breen had a motive to retaliate against plaintiff because he complained about sexual harassment. Plaintiff offers nothing but speculation that someone above Breen instructed her to assign plaintiff inferior routes because that unknown superior harbored a retaliatory motive. That is insufficient to show pretext for defendant's non-retaliatory explanation, *Womack*, 619 F.2d at 1296, and thus, insufficient to avoid summary judgment. *See Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) ("To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." (internal quotation marks and alterations omitted) (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011))).

Further, the record supports the conclusion that plaintiff's change in revenue resulted from his failure to perform loads in November 2020. During the 18-day period between when plaintiff reported the harassment on November 2, 2020, and his resignation on November 20, 2020, plaintiff missed at least two loads and several days passed when Breen could not get in touch with plaintiff. (Doc. 29-2, at 76). Breen was unaware of why plaintiff ended up with the Truck in Council Bluffs, because she was told to not plan loads for him in the Midwest for safety concerns. (*Id.*). In short, plaintiff's performance during the 18-day period at issue was impaired,[2] which is a non-retaliatory explanation

---

[2] Whether plaintiff's performance was impaired because of mental stress induced by Gatena's sexual harassment is immaterial. Here, the question is whether defendant retaliated against

for his change in revenue. *See Womack*, 619 F.2d at 1296. Although plaintiff argues that a reasonable inference can arise from the decrease in his revenue that it must have been retaliation, it is not reasonable when, as here, it is based on speculation. *See Rusness v. Becker Cty., Minn.*, 31 F.4th 606, 614 (8th Cir. 2022) ("[T]o show a genuine issue of material fact, a party must provide more than conjecture and speculation. Rather, the nonmovant has an affirmative burden to designate specific facts creating a triable controversy." (citation omitted)). Thus, this argument is again insufficient to show pretext for defendant's non-retaliatory explanation, *See Womack*, 619 F.2d at 1296, and thus, insufficient to avoid summary judgment, *See Williams*, 889 F.3d at 931.

### 2. *Retaliation by Removal From Truck*

Plaintiff also argues that defendant retaliated against him by having him unnecessarily removed from the Truck at gunpoint. (Doc. 42, at 20-22). Defendant argues that it has a legitimate, non-retaliatory reason to have plaintiff removed from the Truck—safety concerns—and, regardless, the removal was not an adverse employment action because plaintiff's relationship with defendant had already terminated. (Doc. 33, at 21-24). The Court finds plaintiff's retaliation theory about being removed from the Truck deficient because, first, he did not plead that claim and, second, it is not supported by the record.

In the factual recitation of his complaint, plaintiff mentions law enforcement officers removing him from the Truck at defendant's request. (Doc. 1, at 8). Counts 2 and 4, the retaliation claims, reallege this fact by reference. (*Id.*, at 11-14; 17-18). Nothing in plaintiff's complaint under Counts 2 and 4, however, mentions plaintiff's removal from the Truck as an act of retaliation. Rather, Counts 2 and 4 address only his

---

plaintiff for reporting Gatena's harassment by altering his loads, leading to lower revenue. If plaintiff's loads changed because he failed to perform loads, then it provides a non-retaliatory explanation for the change in revenue, regardless of why he failed to perform.

decrease in revenue.[3]  Thus, plaintiff's complaint cannot be fairly read as claiming that his removal from the Truck was an act of retaliation.  Thus, the Court finds summary judgment appropriate on this theory of retaliation because plaintiff never pled that theory in his complaint.

Regardless, the Court finds summary judgment appropriate because the record does not support a finding that removing plaintiff from the Truck was an act of retaliation. *See Burlington N. & Santa Fe Railway Co.*, 548 U.S. at 68; *Clark Cnty. Sch. Dist.*, 532 U.S. at 271.  To start with, there is a genuine issue of fact whether Breen directed plaintiff to return the Truck to Dubuque (he claims Breen told him to; she says otherwise) and whether defendant knew of plaintiff's mental illness problems (he claims Kohlwes did not; Kohlwes says otherwise).  Nevertheless, the Court finds the disputed facts immaterial.  Plaintiff had tendered his resignation by the time officers removed him from the Truck.  Whether plaintiff was returning the Truck to Dubuque on his own volition or because Breen told him to do so, he was no longer working as a driver for defendant.  Thus, it likewise does not matter whether Kohlwes had sufficient knowledge of plaintiff's mental illness to justify calling the police to have plaintiff removed from the Truck.  Plaintiff had resigned and thus terminated his relationship with defendant.[4]  *See Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 516 (3d Cir. 2004) ("Once [the plaintiff's]

---

[3] Count 1 discusses a hostile environment culminating in plaintiff being confronted at gun point by law enforcement.  (Doc. 1, at 9-10).  This, however, does not pertain to plaintiff's retaliation claims.

[4] Plaintiff emphasizes that his resignation letter did not express a "clear" end date.  (Doc. 42, at 20).  The letter of resignation contains no contingent language suggesting his resignation was anything except immediate.  The letter starts: "Please accept this letter as my formal resignation as a lease operator for Hirschbach Motor Lines, Inc."  (Doc. 29-2, at 41).  It ends: "I cannot continue to drive in this environment and it is for that reason that I am resigning my position." (*Id.*).  Thus, no reasonable juror could read this letter as indicating anything but plaintiff's immediate termination of his relationship with defendant.

employment was terminated it was not possible for her to suffer adverse employment action."). The Truck was leased and did not belong to him. Returning the Truck was not performing truck driving services for defendant that continued his work relationship with defendant.[5]

Thus, the Court finds that summary judgment is appropriate against plaintiff on his retaliation claims in Counts 2 and 4.

### C. Whether There is Evidence Defendant Knew of Danger

Defendant argues that it is entitled to summary judgment on plaintiff's negligent hiring, retention, and supervision claim in Count 5 because the record lacks any evidence that defendant knew, or should have known, of Gatena's proclivity to sexually harass others, or that defendant's negligence caused plaintiff's injuries. (Doc. 33, at 24-31). Plaintiff argues that defendant had reason to be concerned about Gatena given her poor job performance, defendant should have seen "red flags" in the manner plaintiff was getting paid, and members of management knew of Gatena's extramarital sexual promiscuity. (Doc. 42, at 22-28). The Court finds summary judgment in favor of defendant is appropriate on Count 5.

"The well established rule is that under the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment." *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999). Iowa recognizes claims of negligent hiring as well as negligent retention and supervision. *Id.*, at 709. Here, defendant argues and the Court agrees that there is no basis of fact in the record to show that defendant had any reason to believe

---

[5] Plaintiff claims "there were issues to button up before the relationship could be completely over" and that returning the Truck to headquarters was one of them. (Doc. 42, at 20-21). Plaintiff does not identify any other "issues" or tasks that had to be "buttoned up," however, and there is nothing in the record to support the assertion that plaintiff had other tasks to perform as part of his work for defendant.

Case 2:21-cv-01014-CJW-MAR   Document 49   Filed 06/28/22   Page 41 of 46

that Gatena would engage in sexual harassment when it hired her. (Doc. 33, at 24 n.4). Plaintiff does not argue otherwise and did not address this issue. He therefore waived that argument.

If plaintiff has a viable claim under Count 5, it is under a theory that at some point during her employment defendant knew or should have known she would sexually harass others and therefore negligently retained and supervised her. Although the court in *Godar* did not articulate the elements of a negligent retention and supervision claim—as distinguishable from a negligent hiring claim—its analysis indicated that for such claims, the "knowledge" element would concern what the employer knew at the time of the alleged wrongful conduct by the employee. *See* 588 N.W.2d at 709. The Iowa Supreme Court later made this clear. To prove negligent retention and supervision, a plaintiff must show:

> (1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct;
> (2) through the negligent . . . supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff; and
> (3) there is some employment or agency relationship between the employee and the defendant employer.

*Est. of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004) (alterations in original); *see also Stricker v. Cessford Const. Co.*, 179 F. Supp.2d, 987, 1019 (N.D. Iowa 2001) (finding the elements of negligent retention and supervision claims to require proof: "(1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct; (2) through the negligent retention or supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused

injuries to the plaintiff; and (3) there is some employment or agency relationship between the employee and the defendant employer").

Here, defendant challenges the first two elements; knowledge and causation. Defendant argues that it did not actually or constructively know and could not have reasonably foreseen that Gatena would sexually harass others, and that therefore its retention and supervision of Gatena could not have caused her to harm plaintiff. (Doc. 33, at 24-30). Plaintiff alleges that the record shows that defendant had constructive knowledge of the sexual relationship between Gatena and plaintiff. (Doc. 42, at 26-28). Plaintiff relies on texts between Gatena and N.S., where he expressed suspicion Gatena was in a sexual relationship with plaintiff, and Gatena's admission to Breen that she and plaintiff had engaged in an "inappropriate incident." (*Id.*).

Defendant argues that plaintiff's evidence is inadmissible double hearsay. (Doc. 33, at 25-26). Defendant is incorrect. It is true that plaintiff cannot testify about this evidence because it is hearsay. But the evidence now before the Court comes directly from N.S. and Breen. Their testimony is not inadmissible hearsay and thus may be considered by the Court.

The question then becomes whether this evidence is sufficient to show that defendant knew or should have known Gatena was sexually harassing plaintiff. N.S. testified that he did not really believe Gatena was having a sexual relationship with plaintiff (even though he and Gatena had previously had a sexual relationship) and that he made the comment as a tasteless joke. Although plaintiff argues that this is an unreliable denial, (Doc. 40-1, at 40), plaintiff has no evidence to the contrary. Further, although N.S. appears to have been a mid-level manager, (*See* Doc. 29-2, at 47, 79), there is nothing in the record showing he supervised or had the ability to fire Gatena. Similarly, there is nothing in the record showing that N.S. passed on to other members

of management at his level or above what he said or may have believed about a sexual relationship between Gatena and plaintiff.

Similarly, Breen testified that she did not believe Gatena and plaintiff were actually having a sexual relationship but, rather, had experienced a single inappropriate incident. Further, as with N.S., there is nothing in the record showing Breen supervised or had the ability to fire Gatena. Similarly, there is nothing in the record showing that Breen passed on to other members of management at her level or above what she knew or may have believed about a sexual relationship between Gatena and plaintiff.

There is evidence of a generally lax attitude about sexual relationships between defendant's employees. The record shows that Gatena had sexual relations with at least two of her coworkers in the past, in addition to her sexual relationship with plaintiff. Indeed, the record reveals a perhaps surprising number of sexual relationships between coworkers,[6] but office-place romances are nothing new. Regardless of whether the number of such relationships here are above or below normal, what is missing from plaintiff's analysis is evidence that defendant knew or should have known that Gatena in particular was engaging in sexual relationships using her position of power to sexually harass another. Sexual promiscuity is not the same as sexual harassment.

Also missing is evidence that members of management were aware of Gatena's propensity to engage in sexual relationships with co-workers. Thus, even if the evidence supports an inference that Gatena was sexually promiscuous, it does not support an inference, let alone a finding that a reasonable jury could reach, that defendant knew of Gatena's sexual promiscuity or that she sexually harassed others.

Plaintiff's reliance on Gatena's otherwise deficient performance and plaintiff's unauthorized payment method (Doc. 42, at 26-27) is misplaced. That Gatena was on a

---

[6] N.S. admitted in his deposition having sexual relations with seven or eight coworkers, for instance.

final warning for other job-performance problems does not in any way put defendant on notice that she would sexually harass another person. Likewise, although defendant's management could have discovered that Gatena had improperly placed plaintiff in the more lucrative 504 cost center where he was paid a percentage of gross revenue for the loads he hauled, that also does not mean defendant should have known that she did so to extract sexual favors from plaintiff. Indeed, Gatena testified that plaintiff pressured her to place him in the 504 cost center. (Docs. 40-3, at 109-110; 45-1, at 5). Whether that is true or not, the point is that even if defendant's management should have looked more closely at how plaintiff was compensated and concluded that it was inappropriate because he did not qualify for the program, there was nothing about that fact alone, or in combination with anything else, that should have led them to jump to the conclusion that Gatena was sexually harassing plaintiff. Gatena could have placed plaintiff in the 504 cost center for other reasons and it would have been complete conjecture for defendant's management to believe that she was using her power to place him in the 504 cost center to extract sex from him.

A negligent retention and supervision claim requires proof that an employer failed "to exercise ordinary care in supervising the employment relationship so as to prevent the foreseeable misconduct of an employee from causing harm to others." *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 42 (Iowa 2018); *Godar*, 588 N.W.2d at 709; *Est. of Harris*, 679 N.W.2d at 680. "At its core, the claim requires proof the employer reasonably should have foreseen the risk of harm to third parties." *Est. of Fields v. Shaw*, 954 N.W.2d 451, 458 (Iowa Ct. App. 2020) (citing *Bandstra*). Here, that evidence is simply lacking.

Thus, the Court finds summary judgment in favor of defendant is appropriate on Count 5 because there is no genuine issue of material fact that would support a claim that defendant negligently retained and supervised Gatena because it knew or should have

45

known Gatena would sexually harass others. Further, absent showing a genuine issue of material fact as to defendant's negligence, plaintiff cannot show a genuine issue of material fact as to defendant's negligence causing his injuries. *See Bandstra*, 913 N.W.2d at 42; *Godar*, 588 N.W.2d at 709; *Est. of Harris*, 679 N.W.2d at 680 (requiring that a plaintiff must show "through the negligent . . . supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff" (alteration in original)).

## IV.   CONCLUSION

For these reasons, the Court **grants** defendant's motion for summary judgment. (Doc. 29). Judgment shall enter in favor of defendant. This case is dismissed.

**IT IS SO ORDERED** this 28th day of June, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

46